# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                               Case No. 06-CR-181

**ANAS SALEM**
        **Defendant.**

## DECISION AND ORDER

A jury convicted defendant Anas Salem of witness intimidation, 18 U.S.C. § 1512, and brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c). Defendant now moves for a new trial based on an alleged <u>Brady</u> violation, arguing that the government failed to disclose evidence relating to the involvement of the prosecution's key witness in a homicide. I deny the motion.

### I. FACTS AND BACKGROUND

**A.    Summary of Case**

The government accused defendant, along with fellow Latin King gang member Marcos Colin, of abducting a gang associate named Carlos Lopez, whom they suspected (correctly, as it turned out) of cooperating with the government in a RICO investigation of the gang. The jury found that defendant used force or threat of force against Lopez to prevent his cooperation in the government's investigation, and that he brandished a firearm in so doing.

Prior to defendant's sentencing, the government disclosed the plea agreement of a Latin King co-defendant, which revealed to defendant for the first time that Lopez was present when that co-defendant murdered a rival gang member. Defendant subsequently requested and the

government provided police reports about the murder. In order to place this post-verdict evidence in context, I review the information presented to the jury at defendant's trial.

## B. Opening Statements

During his opening statement, the prosecutor told the jury that defendant, Colin and Lopez were members of the Latin Kings, a gang which protected its turf on the south-side of Milwaukee through violence and intimidation. (Tr. at 9.) He stated that the Kings attacked rival gang members, whom they called "flakes," and intimidated witnesses or cooperators. (Tr. at 9.) In the fall of 2005, the government obtained an indictment against forty-nine Latin Kings, including Lopez and defendant's brother, Sadam Salem. (Tr. at 10.) The prosecutor told the jury that Lopez began cooperating pre-indictment, implicating himself and others in gang activity. (Tr. at 10.) On November 1, 2005, about a month after the filing of the indictment, defendant and Colin confronted defendant, accused him of cooperating, assaulted and threatened to kill him, but eventually let him go. Thereafter, the government relocated Lopez out of state. (Tr. at 10-18.)

In her opening statement, defense counsel stated that Lopez told different stories about what occurred during his encounter with defendant and Colin. (Tr. at 18-19.) She also stated that Lopez was cooperating with the government prior to the incident and hoping to get money to get out of town. (Tr. at 20.) She further stated that law enforcement told Lopez that they were interested in defendant, who was not included in the original Latin Kings indictment handed up earlier in 2005, and that Lopez knew as an informant that he could get favors from the government if he told the government what it wanted to hear. (Tr. at 20.)

### C. Witness Testimony

#### 1. Shane Bach

The government first called Shane Bach, who testified that on November 1, 2005, he and Lopez drove to a friend's house, where they encountered defendant and Colin (known to Bach as "Scetty"). Bach testified that defendant asked Lopez why he was snitching, putting the "brothers [in] jail." (Tr. at 23-24.) Defendant and Colin got into defendant's car, and one of them made a reference to "having one in the chamber." (Tr. at 25.) Lopez offered to take defendant and Colin to his house to provide them some paperwork that showed he wasn't snitching. Once they arrived, Lopez, defendant and Colin entered Lopez's house, and Bach – who had a "weird feeling" – took off. (Tr. at 26-28.) On cross-examination, Bach admitted that he did not call the police after he left, and that defendant did not directly threaten Lopez in the car. (Tr. at 30-31.)[1]

#### 2. Carlos Lopez

The government next called Lopez, who testified that he was under indictment as part of a Latin Kings RICO prosecution, and that he was cooperating with the government. (Tr. at 66-67.) Lopez testified that on November 1, 2005, he and Bach drove to the home of an individual named Jose, where they encountered defendant and Colin. (Tr. at 68-69.) Lopez stated that defendant and Colin asked, "why did [you] do this." (Tr. at 69.) Lopez started to put the car in gear, but defendant threatened to shoot him in the face. (Tr. at 69.) Defendant

---

[1]The government next called Colin, but he refused to testify, even if granted immunity and threatened with contempt. (Tr. at 34-61; 174-82.) He did admit being in jail for his role in Lopez's kidnaping. (Tr. at 35.) An FBI agent called by defendant later recounted Colin's statement to law enforcement, in which Colin said that defendant orchestrated the kidnaping. (Tr. at 195.)

3

and Colin got in the back of the car, and defendant asked Colin if he had "one in the chamber." (Tr. at 70.) Defendant accused Lopez of snitching and stated that "all the brothers [i.e., Latin Kings] are locked up." (Tr. at 71.) Lopez claimed that he had paperwork at his house showing he wasn't cooperating, and defendant said he wanted to see it. (Tr. at 71-72.) Once they arrived at Lopez's house, defendant warned Lopez not to do anything stupid or he would shoot Lopez's mother. (Tr. at 72.)

Lopez, defendant and Colin entered the house and encountered Lopez's mother. Lopez asked his mother where his paperwork was and winked at her to try to tell her something was wrong. (Tr. at 73-74.) Lopez could not find any paperwork – there was nothing to find – and defendant ordered him back out of the house. Lopez's mother followed and told Lopez that he had a curfew and had to stay inside, but Lopez testified that he left because he was afraid of what defendant would do if he did not comply. (Tr. at 75-76.)

Once the three got back outside, Lopez noticed that Bach was gone. Defendant told Colin to drive, Lopez to get in the front passenger seat, and he (defendant) got into the rear passenger seat behind Lopez. (Tr. at 77.) Defendant told Lopez to direct them to Bach's house, defendant complied, and the three proceeded to Bach's neighborhood, parking a block away from the house. (Tr. at 78.) The three men exited the car and started walking toward Bach's house through a gangway. Defendant ordered Lopez to open a gate on the gangway, but Lopez refused. Defendant then ordered Lopez to turn out his pockets, and Lopez turned over $80.[2] Defendant again ordered Lopez to open the gate, and when he refused defendant produced a gun from the pocket of his hooded sweatshirt. (Tr. at 79-81.) Defendant looked

---

[2]Lopez testified that defendant had previously taken his cell phone.

4

to the left and the right, and Lopez believed defendant was about to shoot him so he grabbed for the gun. The two struggled for the gun, but Colin hit Lopez in the back of the head and Lopez fell to the ground. Defendant got on top of Lopez and said, "I should kill you right now." (Tr. at 82-83.) Lopez asked defendant and Colin why they were doing this, stating that he used to feed them. (Tr. at 83.)

Defendant told Lopez to get up, and they returned to the car, where defendant instructed Lopez to drive to the "2-1 hood," where defendant said he wanted to shoot some "flakes," i.e. rival gang members. (Tr. at 84-86.) Finding no flakes, the three continued to drive around, and defendant stated that he would return Lopez's things once Lopez provided his paperwork. (Tr. at 86.) Lopez testified that he and his family stayed in a hotel that night because they were afraid to go home. (Tr. at 88.)

Lopez stated that he expected no credit in his own case based on his testimony against defendant. Rather, he said that he testified because he was a crime victim. (Tr. at 90.)

On cross-examination, Lopez admitted that he faced significant penalties in his indictment, up to life in prison on a RICO charge and a minimum of ten years up to life on a drug charge, along with various other charges. (Tr. at 94-96.) He further admitted that he decided to cooperate with the government in that case, but claimed not to understand how substantial assistance could affect his potential sentence. (Tr. at 97-98.) He further admitted that Colin falsely claimed responsibility for a gun found at his house, which he allowed Colin to do. (Tr. at 99.)

Defense counsel also cross-examined Lopez on his prior statements and contacts with law enforcement. (Tr. at 105.) Lopez admitted that he previously gave different versions of who was driving on November 1, 2005, and that he once said that defendant took his phone

5

on the gangway not in the car. (Tr. at 109-110.) Lopez also admitted that he was arrested in West Milwaukee for drinking and damaging property while on bond in his federal case, that he told the arresting officers that he was a cooperating federal witness, and that his bond was not revoked based on his conduct. (Tr. at 118-20.) Finally, he admitted that an agent advised him that law enforcement was interested in defendant in 2005 (before defendant's indictment), and that he (Lopez) provided the government with no incriminating information about defendant's brother, Sadam, who was included in the initial Latin Kings indictment. (Tr. at 105; 122.)

### 3. Norma Chavez

Finally, the government called Lopez's mother, Norma Chavez, who testified that on November 1, 2005, her son came home with defendant and Colin and started rummaging through some papers, asking "where are those statements." (Tr. at 158-59.) Chavez testified that she did not know what Lopez was talking about. She said that defendant stood close behind her son with his hand in his pocket. (Tr. at 159.) She stated that Lopez appeared worried, and she sensed something wasn't right. (Tr. at 160.) After about five minutes the three men left the house; she tried to get Lopez to stay, but they left, with Colin driving, Lopez in the front passenger seat and defendant behind him. (Tr. at 161.) Chavez testified that Lopez looked scared and told her to go back in the house. (Tr. at 162.)

Chavez testified that when she saw her son later that night he had injuries to his neck and face, and that they stayed in a hotel that night. (Tr. at 163-64.) She further stated that she then relocated out of state with her son, leaving a job she had held for seventeen years. (Tr. at 165-66.) On cross-examination, Chavez admitted that she did not call the police after Lopez left the house, and that she went to work that night. (Tr. at 172-73.)

6

### 4. Agent Porrini

Defendant called FBI Agent Douglas Porrini, who reviewed Lopez's and Colin's previous statements to law enforcement about this incident. (Tr. at 188-196.)

### D. Closing Statements

In his closing, the prosecutor again stated that Lopez would receive no consideration for his testimony in this case because he appeared as a victim. (Tr. at 211-12.) The prosecutor further noted that while Lopez varied on some of the details, his testimony on the essential facts never waivered. (Tr. at 212.) The prosecutor also noted that despite his cooperation Lopez faced serious federal charges, and that his release on bail was based on his lack of prior record and his mother's willingness to post a significant bond. (Tr. at 214.) The prosecutor then reviewed the testimony from Bach, Lopez and Chavez concerning the abduction. (Tr. at 214-19.)

In her closing statement, defense counsel discussed the inconsistencies in Lopez's statements about the incident, and the illogic of Lopez's bringing these armed men into his mother's house to show them non-existent paperwork. (Tr. at 220-24.) She further noted the lack of corroboration of the confrontation in front of Jose's house and of the struggle on the gangway by any other witnesses (Tr. at 225), and the illogicality of Lopez's then accompanying the men, perhaps willingly, to other locations after the struggle. (Tr. at 225-27.) She also noted that despite her claim to be afraid for her son's safety, Chavez did not call the police and instead went to work after Lopez, Colin and defendant left her house. (Tr. at 228-29.)

Counsel suggested that Lopez may have invented the story of his abduction in order to explain his violation of curfew to pre-trial services. (Tr. at 229-30.) She also noted the lack of

7

evidence that Lopez specifically cooperated against defendant's brother, Sadam. (Tr. at 230.) Finally, she noted that although Lopez was not supposed to specifically get credit for testifying in this case, he did face significant penalties and obviously had good reason to curry favor with the government. (Tr. at 232-33.)

**E.     Verdict and Post-Verdict Disclosures**

I then instructed the jury, which deliberated for a little over an hour before returning guilty verdicts on both counts. (Tr. at 254-55.) I denied defendant's motions for acquittal and set the case for sentencing. (Tr. at 256.)

Just before defendant's sentencing, the government filed a plea agreement with one of the co-defendants in this case. The co-defendant pleaded guilty to racketeering, with predicate acts of murder. In the factual basis section, the agreement stated that the co-defendant shot and killed a man named Francisco Avita. In his motion for a new trial, defendant acknowledges that he received in discovery statements made by Lopez implicating this co-defendant in the Avita murder.

The plea agreement further stated that Lopez was present when this co-defendant murdered another alleged gang rival, Adan Sotelo. Specifically, the agreement recounts a statement by Lopez that he and the co-defendant hid and waited for Sotelo, and when Sotelo came around the corner the co-defendant shot Sotelo several times, killing him. Lopez stated that he and the co-defendant then ran away. Lopez further recounted that Sotelo was killed because the Latin Kings believed him to be a rival gang member.

The government had not previously provided defendant with information about the Sotelo killing. Thereafter, defense counsel requested and the government provided police reports on the Sotelo case, which counsel filed with the court. A review of those reports reveals

8

that, according to one witness, Sotelo was shot by a single assailant, a young Hispanic male. (R. 84 at 9.) This witness's son saw two suspects, whom he described to police. (R. 84 at 21, 39.) Another witness told police that she observed two suspects approach, one pulled a gun and shot Sotelo, and both suspects then ran. (R. 84 at 50.) Police apparently showed witnesses photo arrays containing Lopez's picture, but no one identified him. (R. 84 at 25, 27.)

In its response to defendant's motion, the government indicates that no witness identified Lopez in the Sotelo shooting, and he was never considered a suspect in that crime. Rather, Lopez voluntarily disclosed his presence at the shooting to the government. (Govt.'s Resp. at 3.) The plea agreement and police reports submitted by the defense confirm this characterization. In his reply, defendant contends that he still has not received all of the reports about the Sotelo matter, including any debriefing statements by Lopez. However, I find that the essential facts relevant to this motion are essentially undisputed, and I see no basis for ordering further disclosure or conducting an evidentiary hearing. For the reasons which follow, I find that the Sotelo murder was likely irrelevant to the issues at defendant's trial and, in any event, there is no reasonable probability that its disclosure to the jury would have changed the outcome.[3]

---

[3] Defendant raises the issue of whether and when Lopez signed a proffer letter. This issue arose at trial. (Tr. at 139.) The government and Lopez's lawyer were unable to locate a signed copy, and the parties agreed to submit an unsigned version. (Tr. at 183-85.) Defendant also argues that if Lopez disclosed the murder during a protected proffer session he could not be held accountable for it. See U.S.S.G. § 1B1.8. However, this assumes that Lopez had some liability in the Sotelo murder, which the record does not support. In any event, for the reasons provided later in this decision, I find the Sotelo matter irrelevant and immaterial.

9

## II. APPLICABLE LEGAL STANDARDS

### A. New Trial

Under Fed. R. Crim. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Where, as here, the motion is based on newly discovered evidence, the court may grant a new trial if the evidence (1) came to the defendant's attention only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it been heard by the jury. See United States v. Womack, 496 F.3d 791, 796-97 (7th Cir. 2007). However, because this case is now on appeal, I may not grant the motion; rather I may "either deny it or, if inclined to grant a new trial, so certify to the court of appeals." United States v. Blankenship, 970 F.2d 283, 285 (7th Cir. 1992); Fed. R. Crim. P. 33(b)(1) (stating that the district court "may not grant a motion for a new trial until the appellate court remands the case"); see also Circuit Rule 57 (7th Cir.) (explaining that if a district court wishes to revise a judgment while the case is on appeal, it should so indicate and the court of appeals may then remand the case).

### B. Brady Standards

Defendant argues that the government's failure to disclose evidence relating to the Sotelo murder prior to trial constitutes a Brady violation. Under Brady, the government must provide to the defendant all evidence in its possession that is favorable to the accused and material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). This includes information concerning the reliability of key government witnesses. Giglio v. United States, 405 U.S. 150, 153-54 (1972). Failure to disclose such evidence amounts to a constitutional violation if it deprives the defendant of a fair trial, United States v. Bagley, 473 U.S. 667, 678

10

(1985), that is, if it undermines confidence in the verdict, Kyles v. Whitley, 514 U.S. 419, 435 (1995). In making this materiality determination, the court weighs the strength of the evidence withheld against the strength of the evidence presented at trial to determine whether a reasonable probability exists that the outcome would have been different had the suppressed evidence been presented to the jury. See, e.g., Lieberman v. Washington, 128 F.3d 1085, 1093-94 (7th Cir. 1997); United States v. Williams, 81 F.3d 1434, 1438 (7th Cir. 1996). This does not mean that the verdict stands so long as the untainted evidence was sufficient to sustain conviction. Rather, the court must consider the entire record to determine whether the new evidence undermines confidence in the outcome. See Williams, 81 F.3d at 1438. However, evidence that is cumulative of other evidence casting doubt on a witness's credibility will generally not be considered material. See, e.g., United States v. Fallon, 348 F.3d 248, 252 (7th Cir. 2003) (collecting cases).

Thus, in order for defendant to be entitled to a new trial as a result of the government's alleged Brady violation here, he must establish that: (1) the prosecution suppressed evidence;[4] (2) the evidence was favorable; and (3) the evidence was material to an issue at trial. United States v. Walton, 217 F.3d 443, 450 (7th Cir. 2000); United States v. Earnest, 129 F.3d 906, 910 (7th Cir. 1997).

### III. DISCUSSION

I will assume for purposes of deciding this motion that the government suppressed the evidence of Lopez's presence at Sotelo's murder, and that such evidence was not otherwise

---

[4] Evidence is suppressed for Brady purposes when, irrespective of the good or bad faith of the prosecution, (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. United States v. Todd, 424 F.3d 525, 534 (7th Cir. 2005).

11

available to the defense.[5] I will also assume, arguendo, that the evidence is favorable.[6] However, I have serious doubts that the evidence would have been admissible. Further, given the strong case presented by the government, there is no reasonable probability that the result would have been different had the jury been told of the Sotelo murder. For these reasons, I find that the evidence is not material.

## A.     Admissibility

"[E]vidence that would not have been admissible at trial is immaterial because it could not have affected the trial's outcome." United States v. Silva, 71 F.3d 667, 670 (7th Cir. 1995). Lopez's presence at the scene of a homicide – even if the circumstances show some possible culpability on his part – does not appear to bear on his credibility.[7] See Fed. R. Evid. 608(b); see also United States v. Willis, 43 F. Supp. 2d 873, 879-80 (N.D. Ill. 1999) (rejecting Brady claim based on extrinsic evidence of other bad acts by witnesses). Lopez has not been

---

[5] The government indicates that it did not disclose the evidence because there was nothing to disclose: Lopez was not implicated as a participant in the Sotelo murder. The government may well be right, but I need not resolve the issue because the motion fails on materiality grounds.

[6] Courts have generally interpreted the term "favorable" broadly, without inquiry into whether the evidence would have been admissible. See, e.g., United States v. Rodriguez, 496 F.3d 221, 226 n.4 (2d Cir. 2007) ("[T]he Government's obligations under Brady to disclose such information does not depend on whether the information to be disclosed is admissible as evidence in its present form."); United States v. Phillip, 948 F.2d 241, 256 (6th Cir. 1991) (stating that admissibility is not a pre-requisite to disclosure); see also United States v. Veras, 51 F.3d 1365, 1374-75 (7th Cir. 1995). However, as I will discusses later, admissibility is relevant to the materiality determination, which is made post-trial. See United States v. Carter, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) (distinguishing pre-trial disclosure of favorable evidence from post-trial analysis of materiality).

[7] In his reply brief, defendant argues that even if the government believes Lopez innocent of wrongdoing in the Sotelo slaying, the jury in his case could have taken a different view. However, he fails to explain how he would have admitted such evidence, even after the government raised the issue of admissibility in its response brief.

12

charged with, much less convicted of, any involvement in the Sotelo murder, so Fed. R. Evid. 609 does not apply.  There is no evidence that Lopez has received a "pass" for his involvement in the Sotelo murder based on his cooperation in this case, which could bear on his credibility, and Brady does not permit a defendant to submit evidence of the unsavory nature of a cooperating witness merely to make the witness look bad (or the government by association). See Silva, 71 F.3d at 670.

In United States v. Pulido, 69 F.3d 192, 202 (7th Cir. 1995), the court confronted this precise issue – a defendant's desire to cross-examine a cooperating witness about his alleged involvement in murders.  The court of appeals affirmed the district judge's exclusion of this line of questioning because it (1) attempted to portray the cooperator as a murderer; (2) suggested that he was testifying favorably for the government in return for a promise of non-prosecution on murder charges, when in fact the government had no basis for such a prosecution; and (3) litigation of the issue would have confused and distracted the jury from its primary task.  The court noted that the defendant was still able to cross-examine the witness about his motives for testifying and cooperating with the government.  Id. at 203.  The same is true in this case: Lopez has not been implicated in the Sotelo shooting; questioning him about his presence at the scene of the crime would do little more than make him appear depraved; and defendant was able to cross-examine Lopez about his motives for cooperating and testifying. See also Wisehart v. Davis, 408 F.3d 321, 325-26 (7th Cir. 2005) ("A criminal trial must not be allowed to turn into an inquiry into disparate treatment of criminals, with the witness being asked whether he'd received any benefit that he would not have received had the state not wanted

13

his testimony and whether therefore he feared retaliation if he stopped playing ball.").[8]

## B. Effect on Outcome

Even if defendant had been permitted to cross-examine Lopez or otherwise present evidence of his role in the Sotelo murder, I can see no reasonable probability that the outcome would have been different. The government presented a strong case against defendant. Lopez testified that he was abducted, threatened and beaten by Colin and defendant, who accused him of snitching. Bach corroborated Lopez's testimony as to the initial encounter with defendant and Colin, and Lopez's mother corroborated Lopez on the events that occurred at her house. The government presented photos of Lopez's injuries suffered in the struggle, and Lopez's testimony as to his resulting apprehension is circumstantially supported by his mother's decision to quit her job of seventeen years and move out of state with him via witness protection.

Defendant cross-examined Lopez about some minor discrepancies in his story, but pointed to little of significance. He also cross-examined Lopez on his motives for cooperating, but Lopez testified without contradiction that he expected no credit for his testimony against defendant; he testified in this trial as a victim, not a cooperator. Defendant presented no evidence – then or now – contradicting this testimony. Nor did defendant present any evidence directly contradicting Lopez's story. Defendant did not take the stand and deny the incident,

---

[8] I also note that defense counsel did not attempt to cross-examine Lopez regarding any of the other RICO predicate acts in which he allegedly participated, information the defense possessed prior to trial. Rather, she (properly, I believe) focused on Lopez's prison exposure and the incentive it created for him to curry favor with the government.

14

and no defense witness contradicted Lopez's testimony.[9] The only witness called by the defense was the lead FBI agent, who reviewed some of the statements he took as part of his investigation of this case, none of which undermined Lopez's testimony in any meaningful way.

Finally, and perhaps most importantly for present purposes, the jury knew that Lopez was part of a violent street gang and had participated in bad conduct himself, yet it still found him credible. The jury also knew that he faced life in prison on racketeering and drug charges based on his involvement with the gang; his alleged involvement in the Sotelo murder would not have increased that exposure. For all of these reasons, I see no reasonable probability that the outcome could have been different had the jury been apprised of this evidence.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for a new trial (R. 79) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of August, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[9]Of course, defendant was under no obligation to testify or present evidence, but I may consider the lack of a defense case in evaluating this motion.

15