# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    **v.**                                **Case No. 06-CR-181**

**ANAS SALEM**
        **Defendant.**

---

## DECISION AND ORDER

This matter is before me on remand from the Seventh Circuit to reconsider the denial of defendant Anas Salem's motion for a new trial. A jury convicted defendant of witness intimidation and brandishing a firearm during a crime of violence based on his abduction and assault of Carlos Lopez, a government cooperator. After trial, the government disclosed evidence pertaining to Lopez's possible involvement in the homicide of a man named Adan Sotelo. Defendant moved for a new trial based on the disclosure, but I found the evidence immaterial and likely inadmissible, and thus denied the motion. United States v. Salem, No. 06-CR-181, 2008 WL 3540471 (E.D. Wis. Aug. 13, 2008). The Seventh Circuit concluded:

> on the record before us, . . . that decision was premature. Lopez's statement about the Sotelo killing has never been turned over to Salem nor has it even been produced to the court. This raises questions about whether other evidence favorable to Salem might be lurking out there and not contained in the record. But Salem didn't get a chance to develop that record, because the court denied his request for an evidentiary hearing. We conclude that was an error. So we remand for such a hearing.

United States v. Salem, 578 F.3d 682, 683 (7th Cir. 2009).

On remand, I ordered the government to produce all evidence regarding Lopez's role in the Sotelo homicide, including any statements made by Lopez regarding that homicide. I

then solicited briefs from the parties addressing whether this evidence was actually suppressed by the government, and whether defendant could have uncovered it with reasonable diligence; the admissibility of the evidence; and if admissible, whether there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The government produced the debrief statements relevant to this issue, defendant filed a revised motion for a new trial in light of the disclosures, and I held a hearing. At the hearing, defense counsel filed under seal the debrief statements upon which she relied, and the parties agreed that all pertinent materials had been turned over. Neither side elected to call any witnesses at the hearing. The matter is therefore ready for decision.

On consideration of the arguments of counsel, the newly disclosed evidence, and the entire record in this case, I deny the motion. I first set forth the facts of the case, which I take largely from my previous decision, supplemented with the statements disclosed on remand.

## I. FACTS

### A. Summary of the Case

The government accused defendant, along with fellow Latin King gang member Marcos Colin, of abducting Lopez, a gang associate, whom they suspected of cooperating with the government in a RICO investigation of the gang. The jury found that defendant used force or threat of force against Lopez to prevent his cooperation in the government's investigation, and that he brandished a firearm in so doing.

Prior to defendant's sentencing, the government disclosed the plea agreement of a Latin King co-defendant, Benny Martinez, which revealed to defendant for the first time that Lopez was with Martinez when Martinez murdered Sotelo, an alleged rival gang member. Defendant

2

subsequently requested and the government provided police reports about the murder.  On remand, the government produced the debrief statements of Lopez, Martinez and fellow gang member Michael Carroll regarding the Sotelo murder.  In order to place this post-trial evidence in proper context and assess its materiality, I will again review the information presented to the jury at defendant's trial.

## B.    Opening Statements

During his opening statement, the prosecutor told the jury that defendant, Colin and Lopez were members of the Latin Kings, a gang that protected its turf on the south-side of Milwaukee through violence and intimidation.  (Trial Tr. at 9.)  He stated that the Kings attacked rival gang members, whom they called "flakes," and intimidated witnesses and cooperators. (Tr. at 9.)  On September 27, 2005, the government obtained an indictment against forty-nine Latin Kings, including Lopez and defendant's brother, Sadam Salem.  (Tr. at 10; Case No. 05-CR-240 (E.D. Wis.))  The prosecutor told the jury that Lopez began cooperating pre-indictment, implicating himself and others in gang activity.[1]  (Tr. at 10.)  On November 1, 2005, defendant and Colin confronted defendant, accused him of cooperating, assaulted and threatened to kill him, but eventually let him go.  Thereafter, the government relocated Lopez out of state.  (Tr. at 10-18.)

In her opening statement, defense counsel stated that Lopez told different stories about what occurred during his encounter with defendant and Colin.  (Tr. at 18-19.)  She also stated that Lopez was cooperating with the government prior to the incident and hoping to get money to get out of town.  (Tr. at 20.)  She further stated that law enforcement told Lopez that they

---

[1]The statements recently produced indicate that Lopez debriefed on September 2, 2005.

3

were interested in defendant, who was not included in the original Latin Kings indictment handed up earlier in 2005,[2] and that Lopez knew that as an informant he could get favors from the government if he told the government what it wanted to hear.  (Tr. at 20.)

## C.    Witness Testimony

### 1.    Shane Bach

The government first called Shane Bach, who testified that on November 1, 2005, he and Lopez drove to a friend's house, where they encountered defendant and Colin (known to Bach as "Scetty").  Bach testified that defendant asked Lopez why he was snitching, putting the "brothers [in] jail."  (Tr. at 23-24.)  Either defendant or Colin made a reference to "having one in the chamber."  (Tr. at 25.)  Lopez offered to take defendant and Colin to his house to provide them with paperwork showing he wasn't snitching.  Once they arrived at the house, Lopez, defendant and Colin entered Lopez's house, and Bach – who had a "weird feeling" – took off.  (Tr. at 26-28.)  On cross-examination, Bach admitted that he did not call the police after he left, and that defendant did not directly threaten Lopez in the car.  (Tr. at 30-31.)

### 2.    Marcos Colin

The government next called Colin, and he admitted being in jail for his role in Lopez's kidnaping.  (Tr. at 35.)  However, he refused to testify further, even if granted immunity. Without objection from the government, I held the issue of contempt in abeyance and continued the trial.  (Tr. at 34-61; 174-82.)  An FBI agent later called by the defense recounted

---

[2]Court records indicate that defendant was initially charged with the instant offenses in June 2006 in Case No. 06-CR-169.  That indictment was later dismissed after the government obtained a superseding indictment in this case, 06-CR-181, which added a RICO count against defendant.  The parties agreed to sever the RICO count and try the witness intimidation and § 924(c) counts separately.  The government later dismissed the RICO count at defendant's sentencing.

4

Colin's statement to law enforcement, in which Colin said that defendant orchestrated the Lopez kidnaping, that he (Colin) agreed with the police version of what happened there, and that defendant had the gun. (Tr. at 195-96.)[3]

### 3. Carlos Lopez

The government next called Lopez, who testified that he was under indictment as part of a Latin Kings RICO prosecution, and that he was cooperating with the government. (Tr. at 66-67.) Lopez testified that on November 1, 2005, he and Bach drove to the home of an individual named Jose, where they encountered defendant and Colin. (Tr. at 68-69.) Lopez stated that defendant and Colin asked, "why did [you] do this." (Tr. at 69.) Lopez started to put the car in gear, but defendant threatened to shoot him in the face. (Tr. at 69.) Defendant and Colin got in the back of the car, and defendant asked Colin if he had "one in the chamber." (Tr. at 70.) Defendant accused Lopez of snitching and stated that "all the brothers [i.e., Latin Kings] are locked up." (Tr. at 71.) Lopez claimed that he had paperwork at his house showing he wasn't cooperating, and defendant said he wanted to see it. (Tr. at 71-72.) Once they arrived at Lopez's house, defendant warned Lopez not to do anything stupid or he would shoot Lopez's mother. (Tr. at 72.)

Lopez, Colin and defendant entered the house and encountered Lopez's mother. Lopez asked his mother where his paperwork was and winked at her to try to tell her something was wrong. (Tr. at 73-74.) Lopez could not find any paperwork – there was nothing to find – and defendant ordered him back out of the house. Lopez's mother followed and told Lopez that

---

[3]The Seventh Circuit stated that I did not mention this evidence in my decision on the motion for a new trial, 578 F.3d at 688, but that is incorrect. See Salem, 2008 WL 3540471, at *2 n.1 ("An FBI agent called by defendant later recounted Colin's statement to law enforcement, in which Colin said that defendant orchestrated the kidnaping. (Tr. at 195.)").

he had a curfew and had to stay inside, but Lopez testified that he left because he was afraid of what defendant would do if he did not comply. (Tr. at 75-76.)

Once the three got back outside, they noticed that Bach was gone. Defendant told Colin to drive, Lopez to get in the front passenger seat, and he (defendant) got into the rear passenger seat behind Lopez. (Tr. at 77.) Defendant told Lopez to direct them to Bach's house, defendant complied, and the three proceeded to Bach's neighborhood, parking a block away from the house. (Tr. at 78.) The three men exited the car and started walking toward Bach's house through a gangway. Defendant ordered Lopez to open a gate on the gangway, but Lopez refused. Defendant then ordered Lopez to turn out his pockets, and Lopez turned over $80.[4] Defendant again ordered Lopez to open the gate, and when he refused defendant produced a gun from the pocket of his hooded sweatshirt. (Tr. at 79-81.) Defendant looked to the left and the right, and Lopez believed defendant was about to shoot him so he grabbed for the gun. The two struggled for the gun, but Colin hit Lopez in the back of the head and Lopez fell to the ground. Defendant got on top of Lopez and said, "I should kill you right now." (Tr. at 82-83.) Lopez asked defendant and Colin why they were doing this, reminding them that his family used to feed them. (Tr. at 83.)

Defendant told Lopez to get up, and they returned to the car, where defendant instructed Lopez to drive to the "2-1 hood," where defendant said he wanted to shoot some flakes. (Tr. at 84-86.) Finding no rivals, the three continued to drive around, and defendant stated that he would return Lopez's things once Lopez provided his paperwork. (Tr. at 86.) Lopez testified that he and his family stayed in a hotel that night because they were afraid to go home. (Tr.

---

[4]Lopez testified that defendant had previously taken his cell phone.

6

at 88.)

Lopez stated that he expected no credit in his own case based on his testimony against defendant. Rather, he said that he testified because he was a crime victim. (Tr. at 90.)

On cross-examination, Lopez admitted that he faced significant penalties in his indictment, up to life in prison on a RICO charge[5] and a minimum of ten years up to life on a drug charge, along with various other charges. (Tr. at 94-96.) He further admitted that he decided to cooperate with the government but stated that he did not understand how substantial assistance could affect his potential sentence. (Tr. at 97-98.) He further admitted that Colin falsely claimed responsibility for a gun found at his house on another occasion, which he allowed Colin to do. (Tr. at 99.)

Defense counsel also cross-examined Lopez on his prior statements and contacts with law enforcement. (Tr. at 105.) Lopez admitted that he previously gave different versions of who was driving on November 1, 2005, and that he once said that defendant took his phone while they were on the gangway rather than in the car. (Tr. at 109-110.) Lopez also admitted that he was arrested in West Milwaukee for drinking and damaging property while on bond in his federal case, that he told the arresting officers that he was a cooperating federal witness, and that his bond was not revoked based on his conduct. (Tr. at 118-20.) Finally, he admitted that an agent advised him that law enforcement was interested in defendant in 2005 (before defendant's indictment in 2006), and that he (Lopez) provided the government with no incriminating information about defendant's brother, Sadam, who was included in the initial,

_____

[5]Lopez's RICO charge listed as predicate acts conspiracy to murder rival gang members (act 10) and attempted murder (act 35), as well as other acts. (Case No. 05-Cr-240, Indictment [R. 12] at 13, 25.) Defense counsel did not cross-examine Lopez about the specific predicate acts alleged; rather, she focused on his prison exposure arising out of the charge.

7

2005 Latin Kings indictment.  (Tr. at 105; 122.)

### 4.   Norma Chavez

Finally, the government called Lopez's mother, Norma Chavez, who testified that on November 1, 2005, her son came home with defendant and Colin and started rummaging through some papers, asking "where are those statements." (Tr. at 158-59.)  Chavez testified that she did not know what Lopez was talking about.  She said that defendant stood close behind her son with his hand in his pocket, that Lopez appeared worried, and that she sensed something wasn't right.  (Tr. at 159-60.)  After about five minutes the three men left the house; she tried to get Lopez to stay, but they left, with Colin driving, Lopez in the front passenger seat and defendant behind him.  (Tr. at 161.)  Chavez testified that Lopez looked scared and told her to go back in the house.  (Tr. at 162.)

Chavez testified that when she saw her son later that night he had injuries to his neck and face, and that they stayed in a hotel that night.  (Tr. at 163-64.)  She further stated that she then relocated out of state with her son, leaving her job of seventeen years.  (Tr. at 165-66.)  On cross-examination, Chavez admitted that she did not call the police after Lopez left the house, and that she went to work that night.  (Tr. at 172-73.)

### 5.   Agent Porrini

Defendant called FBI Agent Douglas Porrini, who reviewed Lopez and Colin's previous statements to law enforcement about this incident.  As indicated above, Colin told law enforcement that defendant orchestrated the kidnaping and carried the gun.  (Tr. at 188-196.)  Defendant did not testify or call any other witnesses.

**D.     Closing Arguments**

In his closing argument, the prosecutor again stated that Lopez would receive no consideration for his testimony in this case because he appeared as a victim. (Tr. at 211-12.) The prosecutor further noted that while Lopez varied on some of the details, his testimony on the essential facts never wavered. (Tr. at 212.) The prosecutor also noted that despite his cooperation Lopez faced serious federal charges, and that his release on bail was based on his lack of prior record and his mother's willingness to post a significant bond. (Tr. at 214.) The prosecutor then reviewed the testimony from Bach, Lopez and Chavez concerning the abduction. (Tr. at 214-19.)

In her closing argument, defense counsel discussed the inconsistencies in Lopez's statements about the incident, and the illogic of Lopez's bringing these armed men into his mother's house to show them non-existent paperwork. (Tr. at 220-24.) She further noted the lack of corroboration of the struggle on the gangway by any other witnesses (Tr. at 225), and the illogicality of Lopez's then accompanying defendant and Colin, perhaps willingly, to other locations (Tr. at 225-27). She also noted that despite her claim to be afraid for her son's safety, Chavez did not call the police and instead went to work after Lopez, Colin and defendant left her house. (Tr. at 228-29.)

Counsel suggested that Lopez may have invented the story of his abduction in order to explain his violation of curfew to pre-trial services. (Tr. at 229-30.) She also noted the lack of evidence that Lopez specifically cooperated against defendant's brother, Sadam. (Tr. at 230.) Finally, she noted that although Lopez was not supposed to specifically get credit for testifying in this case, he did face significant penalties and obviously had good reason to curry favor with the government. (Tr. at 232-33.)

9

## E.    Verdict and Post-Verdict Disclosures

The jury deliberated for a little over an hour before returning guilty verdicts on both counts.  (Tr. at 254-55.)  I denied defendant's motions for acquittal and set the case for sentencing.  (Tr. at 256.)

Just before defendant's sentencing, the government filed the plea agreement it reached with co-defendant Benny Martinez.  Martinez pleaded guilty to racketeering, with predicate acts of murder.  In the factual basis section, the agreement stated that Martinez shot and killed a man named Francisco Avita.  Defendant acknowledged that he had previously received in discovery statements made by Lopez implicating Martinez in the Avita murder.  The plea agreement further stated that Lopez was present when Martinez murdered Sotelo.  Specifically, the agreement recounted a statement by Lopez that he and Martinez hid and waited for Sotelo, and when Sotelo came around the corner Martinez shot Sotelo several times, killing him. Lopez stated that he and Martinez then ran away.  Lopez further recounted that Sotelo was killed because the Latin Kings believed him to be a rival gang member.  The government had not previously provided defendant with information about the Sotelo killing.  Defense counsel requested and the government provided police reports on the Sotelo case, which counsel filed with the court.  According to the reports, one witness stated that Sotelo was shot by a single assailant, a young Hispanic male.  (R. 84 at 9.)  This witness's son saw two suspects, whom he described to police.  (R. 84 at 21, 39.)  Another witness told police that she observed two suspects approach, one pulled a gun and shot Sotelo, and both suspects then ran.  (R. 84 at 50.)  Police apparently showed witnesses photo arrays containing Lopez's picture, but no one identified him.  (R. 84 at 25, 27.)

On remand, the government produced three debrief statements about the Sotelo

10

murder. The first was taken from Carroll on August 31, 2005. Carroll said that on December 9, 2004, he was driving on the south-side of Milwaukee with passengers Carlos Avila, Benny Martinez and Carlos Lopez when they saw some rival gang members. Carroll drove to another location, where two other Latin Kings, Emmanuel Martinez and Tim Vallejo, were working.[6] Emmanual Martinez gave Benny Martinez a 9mm pistol, and the men drove back to where they had seen the rival gangsters. Carroll and Avila remained in the car, while Benny Martinez and Carlos Lopez walked toward the rivals. Martinez fired several shots at the rivals, and he and Lopez then ran back to the car, and Carroll sped away. Carroll drove to Lopez's house and parked in the backyard to conceal the car. Benny Martinez left alone on foot and walked to his aunt's house, and later gave the gun back to Emmanuel Martinez. The second statement, taken from Carlos Lopez on September 2, 2005, was virtually the same as Carroll's. (R. 110.)

The final statement, taken from Benny Martinez on October 27, 2006, was a bit different. He had Avila rather than Carroll driving, and said that Vallejo rather than Emmanual Martinez provided him with the gun. Benny Martinez stated that after he and Lopez exited the car, the rival gang members started walking toward them, Lopez cocked the pistol and hand it to him, and he (Benny Martinez) then fired several shots at the approaching men. Benny Martinez said that they ran back to the car, and he gave the gun to Lopez, who put it in his pants. Avila then drove them back to Lopez's house. Martinez said they left the gun at Lopez's house. (R. 110.)

## II. APPLICABLE LEGAL STANDARD

Under Fed. R. Crim. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." To obtain a new trial based on newly discovered evidence,

---

[6]Court records indicate that Emmanuel Martinez and Tim Vallejo, as well as Carroll, were included in the original Latin Kings indictment in Case No. 05-CR-240.

11

the defendant "must show that the evidence (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if presented at a new trial would 'probably result in acquittal.'"  United States v. Reyes, 542 F.3d 588, 595 (7th Cir. 2008) (quoting United States v. Palivos, 486 F.3d 250, 255 (7th Cir. 2007)).  In order to obtain a new trial based on a violation of Brady and its progeny, see Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the government must turn over all evidence in its possession that is favorable to the accused and material to guilt or punishment), the defendant must show that: (1) the evidence at issue was favorable, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) the evidence was material to an issue at trial.  E.g., United States v. Kimoto, 588 F.3d 464, 474 (7th Cir. 2009); United States v. Daniel, 576 F.3d 772, 774 (7th Cir. 2009).  Suppressed evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  E.g., United States v. Jumah, 599 F.3d 799, 808 (7th Cir. 2010); United States v. Are, 590 F.3d 499, 509 (7th Cir. 2009).

### III.  DISCUSSION

The government has conceded that the evidence related to the Sotelo murder was "suppressed" under Brady.[7]  I will also assume, as I did originally, that this evidence was not otherwise available to the defense, and that it was favorable.  However, on careful

---

[7]At the hearing on remand, the government explained that it did not turn over this material because it did not believe disclosure was required.  I have no reason to doubt this explanation or to suspect any bad faith on the part of the government.  However, because Brady may be violated by inadvertent as well as intentional suppression, I continue with the analysis.

12

consideration of the entire record, I find that the new evidence is not material.

As the Seventh Circuit acknowledged, this evidence could not be presented to degrade Lopez's character. <u>Salem</u>, 578 F.3d at 686-87; <u>see also</u> Fed. R. Evid. 608(b).[8] Rather, it would go only to his bias and motive to curry favor with the government. For several reasons, it is not reasonable to believe that introduction of the evidence on this theory could have affected the outcome.

First, the record, now fully developed, shows that Lopez did not receive a "pass" related to the Sotelo homicide based on his cooperation; nor did the government at any time suggest to Lopez that he had to help make cases, against defendant or anyone else, or face charges for the Sotelo murder. Second, the timing of events in this case rebuts any argument that Lopez concocted the story of his abduction to avoid liability for the Sotelo murder; the government had already made its charging decision at the time Lopez reported his abduction and assault; and the record contains no evidence suggesting that Lopez made the assault up out of a sense of gratitude for not being charged. Third, the new evidence, properly understood, does not meaningfully differ from the evidence available to the defense at the time of trial; indeed, it may be less damaging to Lopez's credibility. Finally, I remain convinced, given the very strong case presented by the government, that the result would not have been different had defendant been able to question Lopez about the Sotelo matter.

**A.      Lopez Did not Receive a "Pass" for the Sotelo Murder**

The Seventh Circuit concluded that the sparse record on the Sotelo homicide may have tainted my consideration of defendant's motion; while the record contained no direct evidence

---

[8]Because Lopez has not been convicted of any involvement in the Sotelo murder, Fed. R. Evid. 609 would not apply either.

13

that Lopez was given immunity for the Sotelo murder, the record at the time seemed incomplete. Salem, 578 F.3d at 687. The record has now been completed; all materials pertaining to this issue have been produced; and there is no evidence that the government declined to charge Lopez in connection with the Sotelo murder as a reward or inducement for his cooperation. Nor is there any evidence that the government in any way suggested to Lopez that he had to assist in making cases, against defendant or others, or face future charges related to the Sotelo murder.

**B.    The Record Does Not Support an Argument That Lopez Concocted the Story of his Abduction to Curry Favor Regarding the Sotelo Murder**

The court of appeals noted that even without an express agreement that Lopez would not be charged with the Sotelo murder in exchange for his testimony, he may nevertheless have been motivated to curry favor with the government. Salem, 578 F.3d at 687. But the record reveals that the government had already made the decision not to charge Lopez in connection with the Sotelo murder at the time Lopez reported his abduction by defendant and Colin.

Lopez gave his debrief statement mentioning the Sotelo murder on September 2, 2005. The original Latin Kings indictment in which Lopez was charged was handed up on September 27, 2005, and unsealed and filed publicly on October 12, 2005. That indictment did not charge Lopez with any involvement in the Sotelo murder. Lopez reported his abduction by defendant and Colin on or about November 1, 2005. It would make little sense for Lopez to make this incident up to curry favor with the government regarding the Sotelo murder when the

14

government had already decided not to charge him with it.[9]  As stated above, the record also contains no evidence that the government suggested to Lopez that it would change its mind and add a murder charge related to the Sotelo slaying if Lopez failed to help make new cases, against defendant or anyone else.

The Benny Martinez debrief statement, which suggested that Lopez had greater involvement in the Sotelo slaying, was given on October 27, 2006, long after Lopez reported the abduction.  Lopez's concern about that statement could not possibly have prompted him to falsely report the abduction in November 2005.  It could perhaps be argued that after the Martinez debrief Lopez had more to worry about; perhaps the government would supersede to add (another) murder charge.  But defendant does not even allege, much less present any evidence, that Lopez was aware of the Martinez debrief at the time he testified at trial (or at any time).[10]

Thus, to the extent that defendant could argue that, even in the absence of a formal immunity agreement, Lopez had motive to curry favor with the government based on the Sotelo murder, the timing negates his theory.  Perhaps defendant could argue that, even though the decision had been made not to charge him, Lopez may have invented the abduction out of a sense of gratitude.  That seems far-fetched; the government did charge Lopez with various

---

[9]The timing of the Carroll statement, taken on August 31, 2005, likewise fails to support an argument that Lopez sought to curry favor by accusing defendant.  Further, defendant has produced no evidence that Lopez was aware of the Carroll statement, at any time.

[10]Defendant states that he would question Lopez about his awareness of the Benny Martinez statement at a new trial.  But I scheduled an evidentiary in this case, in which defendant could have presented evidence or testimony on these important issues.  He chose to present no testimony or evidence (aside from the three debriefs) at that hearing.  I am therefore left with no more evidence of bias than when I ruled on the motion initially.

15

offenses carrying a penalty range of 10 years to life in prison (which included acts of conspiring to murder rival gang members and attempted murders); to the extent that he had a motive to help the government with his testimony, the charges he did face (and about which he was cross-examined) provided ample motivation. The jury nevertheless believed his testimony.

It is also important to note that defendant has not established Lopez's liability for the Sotelo murder, such that he needed a "pass." The Seventh Circuit indicated that the statement in the Martinez plea agreement "suggests that Lopez was a participant in the lying-in-wait murder to protect the Latin Kings' interests, and not a mere witness." Salem, 578 F.3d at 687. However, on remand, the parties agreed that the factual statements contained in Benny Martinez's plea agreement were not entirely accurate. As characterized by the court of appeals, the plea agreement indicated that Lopez "and Martinez hid in an alley gangway waiting for Sotelo, and when Sotelo rounded the corner, Martinez shot him to death." Id. at 683. But as the government explained at the evidentiary hearing, the murder actually occurred in the manner described in defendant's motion and the debriefs.

Defendant argues that Lopez's debrief makes clear his liability as an aider and abettor, but he fails to explain how this is so. See, e.g., United States v. Bonty, 383 F.3d 575, 579 (7th Cir. 2004) (noting that "mere presence at the time of the crime is not enough to support a conviction" for aiding and abetting). In any event, defendant also fails to explain how not being charged with aiding and abetting the Sotelo murder would create a greater incentive to lie than the crimes with which Lopez had already been charged, crimes creating exposure of up to life in prison.

Finally, even if Lopez had some possible aiding and abetting liability, at the evidentiary hearing the government stated, without contradiction, that only the actual shooters had been

16

specifically charged with homicides in the Latin Kings case. Lopez was treated no differently than any of the other gang members similarly situated. Defendant presents no evidence or argument to the contrary. Thus, if I were to grant a new trial, defendant would cross examine Lopez about a murder with which the government decided not to charge him, based not on his cooperation but rather on its consistent exercise of prosecutorial discretion in this case. There is no evidence supporting the defense claim that Lopez was somehow beholden to the government and thus pressured to please based on the charging decision on the Sotelo matter.

## C. The New Evidence Does not Significantly Differ from the Evidence Available to Defendant at Trial

I also cannot accept the argument that evidence of the Sotelo murder was significantly different from the information defendant had at the time of the trial. In his motion for a new trial after remand, defendant indicates that while he had some information related to Lopez's interest in currying favor with the government, i.e. the pending drug and firearm charges, it was impossible to plumb the full extent of his bias because the government failed to disclose information related to the most serious offense with which he was involved in his Latin King career, i.e. aiding and abetting Benny Martinez's killing of Sotelo. But this ignores the fact that in the original Latin Kings indictment the government charged Lopez in racketeering act 10 with conspiring to murder rival gang members and in act 35 with attempted murder (among other acts). Defendant fails to explain how any of the new debrief statements would suggest that Lopez had greater motive to lie in order to curry favor regarding his possible aiding and abetting exposure in the Sotelo murder than he did to curry favor regarding the other acts (including

17

conspiracy to murder and attempted murder) with which he had actually been charged.[11]

Defendant argues that evidence regarding the Sotelo murder would have tended to show Lopez's understanding that he received special treatment in a pass from prosecution for his involvement in a homicide, even in the absence of an explicit agreement. It would have revealed a reason for him to feel indebted and obliged to assist. But the record now shows that Lopez did not, in fact, receive a pass. Further, the record shows that at the time he reported his abduction by defendant, Lopez already knew that he had not been charged. Defendant presents no plausible basis for believing that Lopez would under these circumstances have made up his abduction out of some sense of gratitude. Finally, defendant presents no evidence that Lopez would have had such an understanding. Again, defendant could have presented testimony at the hearing, including from Lopez, but he chose not to.

In his motion and at the hearing, defendant posited the manner in which he would introduce this evidence, asking Lopez if he made the admissions contained in his debrief; if he denied doing so, defendant would introduce the statement through the agent who took it. He would then ask Lopez whether he was aware of Martinez's statement. Finally, he would ask Lopez if he was charged with the Sotelo murder. This evidence, he submits, would support the inference that he is indebted to the prosecution. He notes that such questioning can be proper, even in the absence of a formal promise of leniency. See, e.g., United States v. Kone, 307 F.3d 430, 439 (6th Cir. 2002); United States v. Leonard, 494 F.2d 955, 963 (D.C. Cir. 1974).

It is true, as defendant notes, that evidence of bias is generally relevant and admissible.

---

[11]In my original decision, I noted that defendant did not cross examine Lopez regarding the specific predicate acts but rather focused on his exposure to life in prison under the RICO, drug and gun charges. I continue to believe that was appropriate trial strategy.

But in this situation, defendant must also show that the new evidence is not cumulative.  See United States v. Knight, 342 F.3d 697, 706 (7th Cir. 2003).   Newly discovered impeachment evidence does not typically warrant relief under Rule 33.  United States v. Reyes, 542 F.3d 588, 596 (7th Cir. 2008).  Here, defendant did cross-examine Lopez about his status as a government cooperator and hope for a reduced sentence based on that cooperation.  Further, as discussed above, defendant could have cross-examined Lopez about the murder-related acts with which he had actually been charged, and the incentive they provided to curry favor with the government.

Defendant says that the evidence of Lopez's cooperation on the pending charges was unimpressive since he denied awareness of substantial assistance or other benefits of cooperation.  But defendant provides no reason to believe that Lopez would have answered differently if questioned about the Sotelo murder.  Again, he presented no evidence on this issue at the evidentiary hearing.

The court of appeals noted that murder is "fundamentally different from other offenses," and that the jury did not hear "about a possible sentence of death," Salem, 578 F.3d at 689.  But the record reveals that Benny Martinez, who actually pulled the trigger and killed Sotelo, never faced a capital sentence.  Indeed, none of the Latin Kings charged with murders in these cases faced a death sentence.  At the hearing on remand, the government explained, without contradiction, that the United States Attorneys' Office for this district generally does not, consistent with Wisconsin law, seek death sentences, and I have not in thirteen years on the bench encountered such a case, even when the facts support a charge of first degree intentional homicide.  Because it is clear that a death sentence was never even on the table in this case, I decline to grant a new trial so defense counsel can question Lopez about it and

19

leave the jury with the false impression that he somehow avoided a capital sentence by cooperating. Further, the court of appeals seemed not to realize that Lopez had been charged with predicate acts of conspiracy to murder and attempted murder; defendant could have questioned Lopez about his incentive to work those charges off. In any event, the record does not support an argument that Lopez had first-degree murder liability in the Sotelo killing.[12]

## D.     The New Evidence is not Material

Finally, having sat through the trial and reviewed all of the evidence, I continue to believe that the government presented a very strong case against defendant, and that admission of the Sotelo evidence would not have affected the outcome. Lopez testified that he was abducted, threatened and beaten by Colin and defendant, who accused him of snitching. Although the Seventh Circuit characterized Lopez as the government's star witness, without whom there would be no case, his testimony was corroborated in significant respects. Aside from a neutral eyewitness to the actual beating (or a confession), it is hard to see how the government could done have more.

First, Bach corroborated Lopez's testimony as to the initial encounter with defendant and Colin. He confirmed that defendant and Colin accused Lopez of snitching, putting the brothers in jail, and referred to having "one in the chamber," which is certainly an implied if not a direct threat.[13]    Second, Lopez's mother corroborated Lopez's testimony as to the events that

---

[12]At the hearing on remand, the government also indicated, without contradiction, that prior to trial the defense had information about Lopez's presence at other Latin King-related shootings and did not make use of that information.

[13]In his motion, defendant claims that Lopez was the only person who testified that he made threats. I disagree; Bach heard defendant and Colin accuse Lopez of snitching and refer to having "one in the chamber."

20

occurred at her house.  Third, Agent Porrini relayed Colin's statement that defendant orchestrated the kidnaping and carried the gun.  Fourth, the government presented photos of Lopez's injuries suffered in the struggle.  And finally, as indicated in my previous decision, the jury knew that Lopez was part of a violent street gang and faced life in prison based on his involvement with the gang, yet still found him credible.  For all of these reasons, there is no reasonable probability that the outcome could have been different had the jury been apprised of the new evidence.

### IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for a new trial (R. 105) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge